**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x
**FELIPE OTEZE FOWLKES,**

                    **Plaintiff,**

      **- against -**

**REGINA RODRIGUEZ; EDWARD M. ADLER;**          **OPINION AND ORDER**
**DENNIS BRSELIN; GLENN S. GOORD;**
**CHAUNCY G. PARKER; KENNETH J.**             **07 CV 1193 (NG) (LB)**
**CONNOLLY; GERARD MURPHY; LORRAINE**
**FELEGY; KIMBERLY SZADY; SCOTT**
**STEINHARDT; UNKNOWN NAMED**
**EMPLOYEES OF NEW YORK STATE DIVISION**
**OF CRIMINAL JUSTICE SERVICES, SEX**
**OFFENDER REGISTRY UNIT; ROBERT**
**LOVERIDGE; HAROLD SMITH; ANTHONY**
**PATRICELLI; JOHN MAY; OFFICER**
**ALDRICH; DANIEL KEATING; UNKNOWN**
**NAMED MEMBERS OF THE TROY CITY**
**POLICE DEPARTMENT,**

                    **Defendants.**
-----------------------------------------------------------------------x

**GERSHON, United States District Judge:**

    *Pro se* plaintiff Felipe Oteze Fowlkes, presently incarcerated in the Souza-Baranowski

Correctional Center in Shirley, Massachusetts, brings this action against New York State and

New York County employees and officials, pursuant to 42 U.S.C. §§ 1983 and 1985, alleging

violations and a conspiracy to violate his constitutional rights by these defendants.

    Before the court are three sets of motions brought by the various defendants. First,

defendants Regina Rodriguez, Edward M. Adler, Dennis Breslin, and Glenn S. Goord

(collectively the "DOCS Defendants"),[1] along with defendants Kimberly Szady and Scott

---

[1] The DOCS Defendants are all employees of the New York State Department of
Correction Services ("DOCS").

1

Steinhardt, move to dismiss plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Second, defendants Chauncy G. Parker, Kenneth J. Connolly, Gerald Murphy, Lorraine Felegy, Ms. Szady, and Mr. Steinhardt (collectively, the "DCJS Defendants")[2] move for an order transferring venue to the Northern District of New York, pursuant to 28 U.S.C. §§ 1391(b) and 1404(a).[3] Third, defendants Daniel Keating, Robert Loveridge, Harold Smith, Anthony Patricelli, John May, and "Officer Aldrich"[4] (collectively, the "County Defendants") move to dismiss plaintiff's complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, or, in the alternative, seek an order transferring venue to the Northern District of New York, pursuant to 28 U.S.C. §§ 1391(b) and 1404(a).

## FACTS

The following facts are alleged in plaintiff's complaint and taken as true for purposes of this motion.

## I.     Plaintiff's History with the County Defendants

According to plaintiff, for a time period spanning approximately eight years, defendant Daniel Keating, Sheriff of the Rensselaer County Sheriff's Office ("RCSO"), and other members of the Troy Police Department ("TPD") engaged in various retaliatory and conspiratorial conduct against him because he is black and an adherent of the religion, "The Nation of Gods and Earths: The Five Percent" (the "Five Percenters"), a group the TPD believed to be a gang and was

---

[2]  The DCJS Defendants are all employees of the New York State Division of Criminal Justice Services ("DCJS").

[3]  Defendants Szady and Steinhardt request to transfer venue in the alternative to their motion to dismiss.

[4]  The identity of the individual named "Officer Aldrich" is not yet known, but plaintiff identifies this defendant as the "John Doe" named in the caption of another civil rights complaint he filed in 1997, *Fowlkes v. Loveridge et al.*, No. 97-1503 (N.D.N.Y. filed Oct. 16, 1997) ("*Fowlkes v. Loveridge*").

"committed to destroying . . . in their city and county." Compl. ¶ 6(19). Plaintiff alleges that he became a target in early January 1996 when he applied on behalf of himself and the Five Percenters for a Community Service Officer position with the TPD, and the TPD responded to his application by taking "drastic measures and [engaging in] illegal tactics . . . in an attempt to run plaintiff and any other member of the Five Percenters . . . out of Troy." *Id.* Plaintiff claims that, in February 1996, Sheriff Keating and members of the TPD burned down his home, and then in June 1996, arranged a "false accusation or frame-up" against him that eventually led to his arrest and conviction for sexual contact with a minor.[5] *Id.*

In addition to his controversial civic activities, plaintiff claims that the County Defendants found another reason to retaliate against him when he filed *Fowlkes v. Loveridge* against them in 1997, alleging that his constitutional rights were being violated during his incarceration at the Rensselaer County Correctional Facility ("RCCF").[6] During the course of

---

[5] According to plaintiff's criminal history record, which is attached to the complaint, plaintiff was convicted on June 6, 1996 in the Troy City Court upon pleading guilty to having sexual contact with an individual greater than 17 years old who is incapable of consent. This misdemeanor offense of sexual abuse in the second degree is the very conviction for which plaintiff was eventually required to register as a sex offender in 2003.

[6] Plaintiff brought various claims against the County Defendants, many of which were decided on motions for summary judgment. On April 19, 2002, Judge Lawrence Kahn, United States District Judge for the Northern District of New York ("N.D.N.Y."), adopted the Report and Recommendation of Judge David E. Peebles, United States Magistrate Judge, which recommended: (1) denying dismissal of plaintiff's claims against the County Defendants on the basis of qualified immunity; (2) granting dismissal of plaintiff's failure to protect claims against defendants Robert Loveridge, Superintendent of RCCF, and Sheriff Keating; and (2) granting dismissal of plaintiff's religious accommodation claim against all defendants based upon a lack of personal involvement.
On March 30, 2004, Judge Kahn considered plaintiff's remaining claims that, by denying him placement in protective custody, defendants violated his rights under the Equal Protection Clause and the Eighth and Fourteenth Amendments. He dismissed plaintiff's claim for compensatory damages under the Eighth and Fourteenth Amendments but held that plaintiff could proceed on his claims for punitive damages based on the same violations.

litigation, plaintiff alleges that the County Defendants engaged in a "lawless pattern of continuing violations" against him, "injur[ing] him as a party or witness in his person and property on account of his having attended court or testified by filing the lawsuit, and . . . imped[ing], obstruct[ing], hinder[ing], and defeat[ing] in that retaliatory manner, the due course of justice with the intent of depriving him of the equal protection of the laws." *Id.* ¶ 6(14). The County Defendants further "deterred him by force, intimidation and threat of prosecution from attending the U.S. Northern District Court to testify freely, fully, and truthfully in the matter of the lawsuit filed against them." *Id.*

In April 2000, and in continued retaliation for his "civil rights community activities" as a member of the Five Percenters as well as for filing *Fowlkes v. Loveridge*, plaintiff claims that the TPD falsely arrested him on fabricated charges of attempted third degree robbery, for which he was "forced into a plea bargain . . . and sentenced to 18 months to 3 years" at Arthur Kill Correctional Facility ("Arthur Kill"), located in Staten Island, New York. *Id.* ¶ 6(19). Plaintiff further claims that, on July 18, 2000, while serving his sentence at Arthur Kill, the County Defendants intentionally misclassified him as a gang member and required him to sign their Correction Bureau Memorandum (the "Memorandum"), acknowledging his membership in a gang and restricting his First Amendment rights in jail.[7] *Id.*

---

[7] Plaintiff attaches to his complaint a copy of the Memorandum, dated November 16, 1995, which is addressed generally to the inmate population from Superintendent Loveridge. The Memorandum states: "No inmate shall engage or encourage others to engage in unauthorized groups or organizations, activities or meetings; or display, wear, possess, distribute, manufacture or use unauthorized insignia or materials. An 'unauthorized organization/group' is any gang or association which has not been approved by the Facility Superintendent." The Memorandum also contains plaintiff's signature, dated July 18, 2000, indicating that he has read and understood the facility rules, and a handwritten note by defendant Anthony Patricelli, Corporal of RCSO, underneath plaintiff's signature and stating that plaintiff "was a member of the SRG group the 5%ers." Compl. Exh. M.

## II.     Plaintiff's Erroneous Risk Level Designation

Plaintiff claims that, in anticipation of his May 23, 2003 release from Arthur Kill, the County Defendants planned another scheme against him whereby he would be targeted "for selective and discriminatory prosecution on sex crimes in Staten Island, Troy, Albany, and Schenectady, New York, and in Pittsfield, Massachusetts." *Id.* ¶ 6(13), (14). Accordingly, on May 3, 2003, Sheriff Keating and defendant John May, a RCSO officer, contacted Regina Rodriguez, plaintiff's correctional counselor at Arthur Kill, and informed her that plaintiff needed to sign a sex offender registration form for his 1996 misdemeanor conviction if he wanted to be released as scheduled.[8]  They further informed Ms. Rodriguez that unless plaintiff

---

[8]     New York's Sex Offender Registration Act, N.Y. Correct. Law §§ 168 *et seq.*, ("SORA") is a comprehensive statutory scheme under which convicted sex offenders are required to register with law enforcement authorities so that information regarding registrants can be disclosed to local law enforcement authorities, entities with vulnerable populations, and the general public under certain circumstances. *See Doe v. Pataki*, 481 F.3d 69 (2d. Cir. 2007) (discussing the purpose and history of SORA). Prior to the discharge, parole, or release of a sex offender, the sentencing court is to determine, upon the recommendation from the Board of Examiners of Sex Offenders (the "Board of Examiners"), the "level of notification" and the "sex offender type"—either a "sexual predator," "sexually violent offender," or "predicate sex offender," as defined under the statute—applicable to each registrant. N.Y. Correct. Law § 168-n(1), (2). The level of notification depends largely on the risk level assigned to the sex offender, determined by the likelihood of re-offense. Level 1 and Level 2 risk designations represent a determination that the individual poses a low and moderate risk of repeat offense, respectively, while a Level 3 designation represents a high risk of repeat offense as well as a threat to public safety. The level of notification also affects what obligations are imposed on the registrant and the type of information that can be released about him. A Level 1 or Level 2 designee is required to register with DCJS, verify his address every year, and provide written notification to DCJS no later than 10 days after a move. A Level 3 designee, in addition to the requirements imposed on Level 1 and 2 designees, must report his employment address and personally verify his address every 90 days with his local law enforcement agency.

Apart from arrest and conviction records, which are public, a law enforcement agency cannot release any information about a Level 1 designee other than the fact of registration. The information is available to those members of the public who call the DCJS-operated telephone number. For a Level 3 designee, the local law enforcement agency is permitted to release the following types of information about the registrant to any entity with vulnerable populations related to the nature of the offense committed by the registrant: an exact address of residence and place of employment, a photograph, and background information regarding convictions, modus

signed the form, "they would file a detainer and come pick him up and return him to Rensselaer." *Id.* ¶ 6(17). In compliance with their direction, Ms. Rodriguez told plaintiff to sign the sex offender registration form and that, if he did so, she would assign him a risk level of "1," the lowest risk level designated provided for under SORA. Plaintiff signed the form given this assurance and not knowing that Ms. Rodriguez would actually "covertly assign[] him a risk level '3,'" the highest risk level designated under SORA. *Id.* ¶ 6(2), (18).

Plaintiff claims that the erroneous risk level designation was not detected by either defendant Edward M. Adler, Deputy Superintendent for Program Services at Arthur Kill, or defendant Dennis Breslin, Superintendent of Arthur Kill, both of whom were required to review plaintiff's registration information. Instead, these defendants approved and forwarded the form to the Sex Offender Registry Unit ("SORU"), where the DCJS Defendants similarly failed to catch the error and approved plaintiff's registration form upon receipt and review. Plaintiff claims the DCJS Defendants also erred by listing DCJS as the registering agency when it was Ms. Rodriguez, Deputy Adler, and Superintendent Breslin who had been responsible for his registration. On the basis of the risk level designation, as indicated on plaintiff's sex offender registration form, defendant Chauncey G. Parker, Commissioner of DCJS, and the other DCJS Defendants listed plaintiff on the "Subdirectory of Level 3 Sex Offenders," a registration information database made available to the public via the DCJS website and hotline number. Commissioner Parker and the other DCJS Defendants also disseminated plaintiff's registration information to the National Crime Information Center ("NCIC") of the Federal Bureau of

---

operandi, and type of victim targeted. Any entity receiving such information is given discretion to further disseminate the information. The DCJS keeps a "Subdirectory of Level 3 Sex Offenders" that is accessible at local law enforcement agencies as well as on the DCJS website and from DCJS by telephone.

Investigation ("FBI"), which then made the information available to every state law enforcement agency through its interstate identification index of criminal history records.

With plaintiff registered as a risk level 3 sex offender, plaintiff claims that, from the day he was released from Arthur Kill, the County Defendants "pursued" him throughout Troy, Albany, and Schenectady, New York, with "young women and girls whom they had to spy on plaintiff and to make false accusations against him for rape and sex crimes using the erroneous risk level '3' sex offender registration information." *Id.* ¶ 6(20). In fear of being framed and falsely imprisoned, plaintiff moved to Pittsfield, Massachusetts on or about June 20, 2003, but was followed by the County Defendants to his new place of residence. There, the County Defendants continued their pursuit of plaintiff, once again employing "young women and girls whom they hired and sent in disguise to spy on plaintiff and to make false accusations against him of rape and sex crimes using the erroneous risk level '3' sex offender registration information." *Id.* ¶ 6(21), (22).

Specifically, plaintiff claims that between July 3, 2003 and July 17, 2003, defendants Harold Smith, Lieutenant of the RCSO, and Officer Aldrich "hired or used their daughters or relatives named Jennifer Smith and Patricia Aldrich to spy on plaintiff and to make false accusations against him of rape, kidnapping, and attempted rape." *Id.* ¶ 6(23). As a result of this particular scheme, plaintiff claims he was falsely arrested on July 16, 2003 for the rape of Ms. Smith and Ms. Aldrich, and that upon his arrest, the County Defendants communicated to the Pittsfield Police Department, namely to Detective Michael Maddalena and Berkshire County Assistant District Attorney, Jedd L. Hall, that plaintiff was a "reputed gang member in the Troy,

New York area."[9]  *Id.* ¶ 6(24).  Plaintiff further claims that, on August 22, 2003, another

Berkshire County Assistant District Attorney, Paul Caccaviello, used the erroneous risk level

designation to indict him for the charges against Ms. Smith and Ms. Aldrich.[10]

On April 20, 2004, plaintiff claims that he entered into an "off-the-record" stipulation

agreement with the County Defendants and the Berkshire County District Attorney's Office

whereby the District Attorney's Office would drop the rape charges filed against him, and, in

exchange, plaintiff would discontinue *Fowlkes v. Loveridge* against the County Defendants.

Plaintiff claims that, in accordance with this agreement, a stipulation of discontinuance was

ordered on May 14, 2004, but that the County Defendants ultimately breached their end of the

agreement by continuing to prosecute him on the charges of rape.[11]  On September 7, 2004,

_____

[9]  Plaintiff claims that "[t]here was no other source from whence the alleged 'gang member' information could have been obtained by the Pittsfield Detective and Berkshire Assistant District Attorney besides the Rensselaer County Sheriff's Correction Bureau Memorandum" because the NCIC did not contain information regarding plaintiff's gang associations.  *Id.* ¶ 6(24).

[10]  Plaintiff claims that the Mr. Caccaviello had to have used the erroneous registration information because the alias names that appear on his indictment were taken from the alias names shown on the NCIC.  Specifically, plaintiff claims that his alias name of "Bisme Allah," used in connection with his Five Percenter membership, had never been "the evidence or element of any sexual crimes."  *Id.* ¶ 6(23).

[11]  On July 14, 2004, Judge Peebles ordered *Fowlkes v. Loveridge* be reopened for the limited purpose of addressing plaintiff's claim that the County Defendants had breached the alleged off-the-record agreement.  On August 6, 2004, Judge Peebles, upon "review[ing] the matter carefully, and having given consideration and deference to plaintiff's *pro se* status," found that "the stipulation of discontinuance, which on its face does not condition discontinuance of the action on the occurrence of any event or fulfillment of any promises, is effective and that as a result of the filing of that stipulation, this action was properly discontinued."  Judge Peebles noted that the stipulation did not discontinue the action with prejudice, and that, as provided under Rule 41(a)(1)(B) of the Federal Rules of Civil Procedure, "[u]nless the notice or stipulation states otherwise, the dismissal is without prejudice."  He accordingly noted that "at least in theory, the plaintiff is now permitted to commence a new action asserting the same claims as previously set forth in this suit, should he so desire."  Plaintiff thereafter appealed Judge Peeble's decision, but on December 15, 2004, Judge Kahn affirmed the order.

plaintiff was tried before a jury in the Berkshire Superior Court in Pittsfield, Massachusetts. Although there was "no forensic or physical evidence to support the alleged crimes" and "no DNA, no eyewitnesses, no surveillance video, no photographs, no confessions, no medical exams, no clothes or any evidence linking plaintiff to the commission of any acts against the young women," the prosecutor, "armed with the erroneous sex offender registration information, . . . relied on the false testimony and false statements" by the victims. *Id.* ¶ 6(27).

On September 17, 2004, plaintiff was acquitted on the two charges against him with respect to Ms. Aldrich but found guilty with respect to the crime committed against Ms. Smith. For his conviction, the prosecutor requested and the judge imposed the maximum sentence range, from 12.5 to 15 years of imprisonment, using the erroneous risk level designation information. In addition to affecting his verdict[12] and sentence, plaintiff also claims that the erroneous designation "affected his confinement," both at the Berkshire County Jail, from July 17, 2003 and September 17, 2004, and at the Massachusetts Department of Corrections, from September 17, 2004 to the present day. Specifically, plaintiff claims that he was "subjected to attempted murder, threats and assaults from jail officials, prison guards and other prisoners who

---

[12] Plaintiff also attaches to his complaint a copy of a letter from one of the jurors from his criminal trial to the presiding trial judge, and argues that he was found guilty "based upon the inadmissible information published in the Berkshire Eagle newspaper during the course of the trial, that plaintiff was a registered risk level '3' sex offender in connection with a 1996 sex contact with a minor offense involving a girl in Troy, New York." *Id.* ¶ 6(28). The juror wrote:

> I have serious misgivings about the manner in which it reached its conclusions. . . . During deliberations members of the jury argued that Mr. Fowlkes was guilty because he was a "predator" and that "he goes from town to town preying on young girls." . . . . These remarks disturbed me, because none of these facts were introduced during the trial. They had however, been disclosed in a series of articles published in the Berkshire Eagle . . .

Compl. Exh. X.

target prisoners registered and described as sexual predators of children," and due to these safety concerns, he has been "assigned to protective custody status and administrative segregation units." Plaintiff further claims that the erroneous registration is "likely to affect his eligibility for parole and other D.O.C. programs to which he has a property and liberty interest[]." *Id.* ¶ 6(30).

### III. Plaintiff Learns of His Erroneous Designation

Plaintiff claims that in or about January 2005, while incarcerated at Arthur Kill, he learned from an article in the Berkshire Eagle newspaper that he was erroneously designated a risk level 3 offender and that this registration information had been published on the DCJS website. Upon discovering these facts, plaintiff submitted a written request to the DCJS Defendants, asking that his information be removed from its registry and the NCIC interstate identification index. Plaintiff further requested a list of persons and entities, particularly residents of Massachusetts, who had requested his information from the DCJS website during the calendar year of 2004. By letter dated February 8, 2005, defendant Lorraine Felegy, Deputy Counsel of the DCJS, responded to plaintiff's inquiry and requests by sending him a copy of "Frequently Asked Questions About the Sex Offender Registration Act (Correction Law Article 6-C)" ("FAQ") and stating that "[t]his document will address the points you raise in your correspondence." *Id.* ¶ 6(7). Neither Ms. Felegy nor the other DCJS Defendants removed plaintiff from the registry or withdrew his information from the NCIC index.

Plaintiff thereafter wrote several letters to DCJS, contesting his sex offender registration process and designation. On July 5, 2005, by letter generally addressed to SORU, plaintiff challenged his sex offender registration, arguing that the sentencing court did not properly certify or register plaintiff as a sex offender pursuant to § 168-d(1) of the New York Correction Law. On July 7, 2005, by letter addressed to SORU as well as to Ms. Rodriguez and Superintendent

Breslin, plaintiff repeated his arguments as set forth in his earlier letter and sought modification of his risk level designation. Then, in a letter dated July 17, 2005 and addressed to Commissioner Parker, plaintiff enclosed a copy of his July 7, 2005 letter for his review and noted that, under the FAQ, "there was no time limit on making this appeal." Compl. Exh. G. On August 10, 2005, plaintiff sent another letter to Commissioner Parker, repeating the contents of his July 17, 2005 letter.

At some point during August 2005, defendant Kimberly Szady, Director of Financial Administration[13] in the Office of Financial Services of the DCJS, responded to plaintiff's letters and denied that plaintiff had been erroneously registered or that the DOCS Defendants at Arthur Kill had registered him and "not the sentencing court and that therefore, the plaintiff had been erroneously registered without sufficient information to support the registration and risk level assignment." Plaintiff accordingly was not removed from the registry nor was his information withdrawn from the NCIC database.

On or about August 14, 2005, plaintiff enclosed a copy of his July 7, 2005 letter in a separate letter addressed to Superintendent Breslin and Arthur Kill. Plaintiff wrote:

> I was required or forced to register by your counselor Ms. Rodriguez, whom erroneously registered me as a risk level '3' which is the most serious category defined as a 'sexual predator' who has committed a sexually violent offense and must be registered for life. However, this is not true of the offense for which she submitted the registration information to NYC DCJS and neither was Arthur Kill NYSDOCS the Supervising Agency for that 1996 crime. . . . [I]t is respectfully requested that you direct Ms. Rodriguez to withdraw the erroneous sex offender registration information from the DCJS and/or to modify the risk level '3' which is clearly erroneous, to a risk level '1'. . . . A risk level appeal can be made at any time, and in this case, it would have been made with the sentencing court if I had been registered and designated a risk level '3' through the court. Instead, I was erroneously registered through NYSDOCS, at your facility.

---

[13] Plaintiff incorrectly named Ms. Szady as Deputy Counsel to the DCJS.

Compl. Exh. I.  By letter dated August 22, 2005, Superintendent Breslin responded to plaintiff's letter and informed him that his letter has been referred to Deputy Superintendent Adler who would investigate the request.  On August 25, 2005, Deputy Superintendent Adler responded to plaintiff and explained that "a review of your concerns indicates that the Sex Offender Registry has already responded to your inquiry regarding you[r] status as a registered sex offender" and that he was a "registered Sex Offender, Level 3."  Deputy Superintendent Adler added that further questions should be directed to the Sex Offender Registry, "although, it appears as if their answer to your questions is perfectly clear."  Compl. Exh. K.

On September 5, 2005, plaintiff sent his July 7, 2005 letter to defendant Glenn S. Goord, the former Commissioner of DOCS, making the same arguments that he presented in his previous letters and explaining that Superintendent Breslin and Deputy Superintendent Adler have "refused to acknowledge the error."  Compl. ¶ 6(11); Compl. Exh. L.[14]  Commissioner Goord, however, did not take the remedial actions requested by plaintiff.

On September 26, 2005, plaintiff submitted a final letter addressed to SORU, asking for copies of various documents, including his "Sex Offender Details Information," Ms. Szady's response letter from August 2005, the registration form from May 5, 2003, defendant's response to his July 7, 2005 letter, and the "Interstate Identification Index or Query."  Plaintiff claims defendants "completely ignored" this letter.  Compl. ¶ 6(8).

## DISCUSSION

### I.      Defendants' Motions to Dismiss

#### A.      Standard of Review

---

[14]  Exhibit L, attached to plaintiff's complaint, contains only the second page of the letter sent to Commissioner Goord.

On a motion to dismiss, the allegations in the complaint are accepted as true, and the court must draw all reasonable inferences in favor of plaintiff. *Zinermon v. Burch*, 491 U.S. 113, 118 (1990); *Thomas v. City of New York*, 143 F.3d 31, 37 (2d Cir. 1998). The court's function is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). Although a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need "detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, --- U.S. ---, 127 S. Ct. 1955, 1964 (2007) (internal quotation marks, citations, and alterations omitted). Indeed, a plaintiff must assert "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974. This "plausibility standard" is a flexible one, "oblig[ing] a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty*, 490 F.3d 143, 158 (2d Cir. 2007).

A *pro se* complaint, in particular, must be "liberally construed and . . . however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. Keycorp,* 521 F.3d 202, 214 (2d Cir. 2008) (internal quotation marks omitted) (quoting *Erickson v. Pardus,* 127 S.Ct. 2197 (2007) (per curiam)). A court "must . . . interpret [*pro se* complaints] to raise the strongest arguments that [they] suggest . . . ; [t]his is especially true when dealing with *pro se* complaints alleging civil rights violations." *Weixel v. Bd. of Educ. of City of New York,* 287 F.3d 138, 146 (2d Cir. 2002) (internal citations and quotations omitted).

For purposes of a motion to dismiss, the complaint is deemed to include "any written instrument attached to it as an exhibit or documents incorporated in it by reference." *Cortec*

*Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (citations omitted). The court may also consider documents or information in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint. *Id.* at 48; *In re Aegon N.V. Securities Litig.*, 2004 WL 1415973, at *5 (S.D.N.Y. 2004). It is also "well established" that the court can rely on "matters of public record." *Vasquez v. City of New York*, 2000 WL 869492, at *1 n.3 (S.D.N.Y. 2000). These documents can be taken into consideration when deciding a motion to dismiss, without converting the motion to one for summary judgment, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002). Furthermore, "[i]f these documents contradict the allegations of the . . . complaint, the documents control and this court need not accept as true the allegations in the . . . complaint." *Rapoport v. Asia Electronics Holding Co.*, 88 F.Supp.2d 179, 184 (S.D.N.Y. 2000); *In re Aegon*, 2004 WL 1415973, at *5.

### B.    Plaintiff's Claims

In his complaint, plaintiff identifies three claims that he is asserting against the defendants:

1.    To seek relief and damages to defend and protect my rights against erroneous registration as a risk level '3' sex offender which has caused me to sustain injuries and deprivations from being targeted as a member of a suspect class of level '3' sex offenders;

2.    To seek relief and damages to defend and protect my equal protection rights under the Fourteenth Amendment to be free from retaliatory conduct from public officials for exercising protected First Amendment activities;

3.    To seek recovery of damages under Title 42 U.S.C.A. § 1985(2)(3) occasioned by injuries and deprivations from a conspiracy to interfere with my civil rights.

Compl. ¶ 7. Reading plaintiff's complaint liberally, the court construes plaintiff's claims as brought pursuant to 42 U.S.C. §§ 1983 and 1985. More specifically, plaintiff alleges that the

defendants violated his due process rights in connection with his illegal registration and designation as a risk level 3 sex offender and his First Amendment rights with respect to the defendants' various acts of retaliation against him on the basis of his race, his membership and participation in a religious group, and his decision to file legal proceedings against certain defendants here. Plaintiff also alleges a conspiracy on the part of various defendants to interfere with his constitutional rights.

### C.     42 U.S.C. § 1983

Section 1983 governs civil rights actions against a person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States." *See Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004). The statute itself is not a source of substantive rights but merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *Patterson*, 375 F.3d at 225. Thus, in order to state a cognizable claim under § 1983, plaintiff must not only allege that a person was acting under color of state law but also that he or she engaged in conduct that deprived him of rights secured by the Constitution or laws of the United States. *See Parratt v. Taylor*, 451 U.S. 527, 535 (1981).

It is also "well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)); *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065-66 (2d Cir. 1989). That an individual occupies "a high position of authority is an insufficient basis for the imposition of personal liability," *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434

U.S. 1087 (1978), and a defendant who occupies a supervisory position cannot be found liable on the basis of *respondeat superior*, *Wright*, 21 F.3d at 501.  For § 1983 purposes, an individual may be found "personally involved" in one of several ways:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986) (citations omitted)).

In addition to the pleading requirements, a § 1983 action must be filed within the three year statute of limitations period.  *See Wynder v. McMahon*, 360 F.3d 73, 76 (2d Cir. 2004); *Patterson*, 375 F.3d at 225.  The claims accrue when the plaintiff "knows or has reason to know of the injury which is the basis for his action."  *Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980) (internal quotation marks omitted), *cert. denied*, 450 U.S. 920 (1981).  Accrual does not depend on plaintiff's receipt of "judicial verification that the defendants' acts were wrongful," but on "when the alleged conduct has caused the claimant harm and the claimant knows or has reason to know of the allegedly impermissible conduct and the resulting harm." *Veal v. Geraci*, 23 F.3d 722, 724 (2d Cir. 1994); *see Barrett v. United States*, 689 F.2d 324, 333 (2d Cir. 1982).  Here, because plaintiff commenced this action on January 16, 2007, any claims he wishes to pursue under § 1983 must have accrued no later than January 16, 2004.[15]

### 1.    Due Process Claims

---

[15]   The County Defendants argue that this action commenced on April 5, 2007, the date on which they received a summons to answer plaintiff's complaint.  However, an action is commenced by filing a complaint with the court.  *See* Fed. R. Civ. P. 4.  Plaintiff did so on January 16, 2007.

With respect to his first claim, plaintiff alleges that each of the defendants participated in an arbitrary and illegal sex offender registration process that violated the provisions of SORA and "other applicable laws." Compl. ¶ 6(1). Specifically, plaintiff alleges that the County Defendants, namely Sheriff Keating and Officer May, "were admittedly without authority" to direct Ms. Rodriguez to register plaintiff as a sex offender using a threat of further detention. Plaintiff alleges as to Ms. Rodriguez the use of a false promise to secure his signature on the registration form and the "covert" assignment of an incorrect risk level designation. Plaintiff further alleges that Deputy Adler and Superintendent Breslin, despite their duty to review his registration form, approved the form in spite of the error and that, even when they, former Commissioner Goord, and defendants Steinhardt and Szady were informed about Ms. Rodriguez's actions, failed to take appropriate action. Similarly, plaintiff alleges as to the DCJS Defendants that they "were required to review and/or did review and approve the signed sex offender registration form," that they listed the DCJS as the registering agency "which it could not have been," and failed to appropriately respond to his appeals. *Id.* ¶ 6(5)-(8). Plaintiff claims that, as a result of the erroneous registration, he was "targeted as a member of a suspect class of level '3' sex offenders, for selective and discriminatory prosecution on sex crimes" and that he consequently suffered various deprivations of his civil rights. *See id.* ¶ 6(12). As relief, plaintiff seeks compensatory and punitive damages as well as equitable relief.[16]

---

[16] Plaintiff seeks $3,000,000 in compensatory damages and $1,000,000 in punitive damages from the DOCS Defendants, and $6,000,000 in compensatory damages and $3,000,000 in punitive damages from the DCJS Defendants. Plaintiff also seeks an order that declares the May 5, 2003 registration as "erroneous, illegal, and violative of plaintiff's constitutional rights"; directs plaintiff be removed from the state registry and the federal NCIC database; and directs SORU to provide plaintiff with a list of persons and entities who requested his sex offender registration information during the years 2003 and 2004. In the alternative, plaintiff seeks an order directing that his registration information be modified so as to reflect a risk level 1

Taking a liberal reading of plaintiff's complaint, the allegations indicate that plaintiff is claiming two due process violations in connection with his registration as a sex offender. First, plaintiff challenges the fact that he was required to register as a sex offender, and second, he challenges the actual risk level assigned to him.

### a. Plaintiff's Registration as a Sex Offender

Plaintiff claims that, "[a]ccording to the registration laws, he was not required to register [for the 1996] offense," because the conviction for "sex contact with a minor . . . was far from being sexual in nature," and he was not certified as a sex offender by the court at the time of his conviction, as required under New York Correction Law § 168-d(1)(a).[17] Compl. ¶ 6(19); Pl.'s Aff. ¶¶ 8, 10.

To begin with, plaintiff does not have a claim as to the fact of his registration as a sex offender because the offense for which he was convicted of in 1996 is a "sex offense" subject to SORA's registration requirements. *See* N.Y. Correct. Law § 168-a(2)(a)(i) (listing a conviction for violating N.Y. Penal Law § 130.60, sexual abuse in the second degree, as an applicable "sex offense").

---

designation and that the ten-year registration period be made retroactive to 1996, the year of his conviction.

[17] SORA provides that "upon conviction of [applicable sex offenses under the statute,] the court shall certify that the person is a sex offender," N.Y. Correct. Law § 168-d(1)(a), and that "[a]ny sex offender, who is conditional[ly] discharge[d] . . . shall, prior to such release or discharge, be informed of his or her duty to register under this article by the court in which he or she was convicted [and the] court shall require the sex offender to read and sign such form and to complete the registration portion of such form." *Id.* § 168-d(2).

However, in cases where the sex offender is confined in a correctional facility, SORA provides that "any sex offender, to be discharged, . . . or released . . . shall at least fifteen calendar days prior to discharge . . . be informed of his or her duty to register under this article, by the facility in which he or she was confined or committed." *Id.* § 168-e(1); *see also* Compl. Exh. C (FAQ About SORA) at 2 ("A sex offender who is incarcerated will be registered by the correctional facility before being released.").

To the extent plaintiff is claiming that defendants forced him to register as a sex offender in a manner that was not compliant with SORA's registration provisions, that claim is time-barred. Plaintiff himself indicates in his complaint that he was directed to sign the sex offender registration form in connection with his 1996 conviction for sexual abuse in the second degree on May 5, 2003. On that date, plaintiff knew the exact conviction for which he was registering, and, as his letters of appeal, dating as early as July 5, 2005 indicate, he also knew that he had not been certified as a sex offender by the court upon his conviction for the 1996 offense. The erroneous registration claim is therefore rejected.

### b. Plaintiff's Designation as a Risk Level 3 Sex Offender

Plaintiff further claims that his rights to due process were violated when he was erroneously designated a risk level 3 sex offender by each of the DOCS Defendants, defendants Steinhardt and Szady, and the County Defendants.[18] However, this claim fails because plaintiff cannot allege the personal involvement necessary for a § 1983 action against these defendants.

Although the court typically accepts plaintiff's allegations as true for purposes of a motion to dismiss, the court is permitted to consider and take judicial notice of certain documents, such as matters of public record, and reject the truthfulness of those allegations that are contradicted by the documents. *See In re Aegon*, 2004 WL 1415973, at *5; *Vasquez*, 2000 WL 869492, at *1 n.3; *Rapoport*, 88 F.Supp.2d at 184. Here, the DOCS and DCJS Defendants attach to their memorandum a copy of a state document, which indicates that, on May 28, 2004,

---

[18] In his complaint, plaintiff specifically names Sheriff Keating and Officer May as participants of his erroneous risk level designation, but he does not exclude the remaining County Defendants. The court liberally construes this claim as alleged against all of the County Defendants. However, as for the other DCJS Defendants, besides defendants Steinhardt and Szady, the court limits its discussion to the named defendants given that the DCJS Defendants have not moved to dismiss the claims against them.

the Troy City County Court, as plaintiff's sentencing court, issued a final determination that plaintiff be designated a risk level 3 offender.[19] Dfs.' Br. Exh. A. Thus, because plaintiff cannot allege that he was assigned his risk level by anyone or any entity other than the sentencing court, he cannot allege against any of the DOCS Defendants, defendants Steinhardt and Szady, or the County Defendants the personal involvement necessary to state a claim under § 1983 with respect to his risk level designation. Indeed, in plaintiff's letters of appeal, plaintiff acknowledges his awareness that it is the sentencing court that determines a registrant's risk level. *See, e.g.*, Compl. Exhs. D, E. The erroneous risk level designation claim against these defendants is accordingly dismissed.

### 2. First Amendment Retaliation Claims

Plaintiff's complaint contains various allegations against the County Defendants with respect to several acts of retaliation taken against him because of his membership in the Five

---

[19] The document, which appears on the letterhead of the State of New York Board of Examiners of Sex Offenders, contains a memo, dated October 6, 2003, from Veronica G. Keegan, a Board Examiner, to the Court Clerk of the Troy Police Court. The memo provides:

> The Board of Examiners of Sex Offenders is recommending a risk level for the above named offender [Felipe Fowlkes], as indicated on the attached Risk Assessment Instrument and case summary and a recommendation regarding a designation, if applicable . . . . Pursuant to the [SORA], the Court must make a final determination of the offender's risk level and designation at least 30 days prior to release, which is now scheduled for 05/24/2003. In such cases where the offender will be released in less than 30 days or has already been released, the Court shall make these final determinations as expeditiously as possible. Please attach this form to the Court's order containing the findings and conclusions of law and forward the information to the [DCJS] and to the offender.

The bottom half of the document, which provides room for the sentencing court to indicate its final determination as to risk level and sex offender type designation, is signed by an acting Troy City Court Judge. The document also bears a stamp indicating that SORU received a signed copy of the form on June 1, 2004.

Percenters and/or his decision to institute legal proceedings against them. Principally, plaintiff claims that the County Defendants retaliated against him by illegally designating him as a risk level 3 sex offender. A liberal reading of his complaint also indicates that plaintiff may be alleging that the County Defendants retaliated against him by: (1) burning down his home in February 1996; (2) framing and falsely arresting him on charges of sexual contact in October 1996, attempted robbery in April 2000, and rape in July 2003; (3) falsely classifying him as a gang member while he was incarcerated at Arthur Kill in July 2000; and (4) impeding his ability to litigate *Fowlkes v. Loveridge*.

A plaintiff asserting a First Amendment retaliation claim must establish: (1) that the speech or conduct at issue was protected: (2) that the defendant took adverse action against the plaintiff; and (3) that there was a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004).

The principal retaliatory conduct plaintiff challenges is the County Defendants' participation in illegally designating him as a risk level 3 sex offender. Plaintiff, however, cannot establish that any of the County Defendants took adverse action against him with respect to his risk level designation, because the sentencing court, and not the County Defendants, issued a final designation as to plaintiff's risk level in accordance with SORA. Because plaintiff cannot state a First Amendment retaliation claim with respect to his risk level designation against the County Defendants, that claim is dismissed.

Plaintiff's claims of retaliation with respect to his home being burned, the various criminal arrests and convictions, and false classification as a gang member are all time-barred. The latest of the allegations, the alleged false arrest in July 2003, accrued at least several months prior to the applicable statute of limitations period.

However, as to the last claim of retaliation, that the County Defendants impeded his ability to prosecute *Fowlkes v. Loveridge*, plaintiff does not indicate in his complaint any dates as to their alleged conduct taken against him. The court assumes, without deciding, that this claim may fall within the statute of limitations since the conduct could have occurred at any point during the time *Fowlkes v. Loveridge* was initiated, on January 16, 1997, to when it was closed, on August 6, 2004.

The County Defendants' argument that this particular claim of retaliation is barred by res judicata and collateral estoppel is without merit. The doctrine of res judicata bars "later litigation if [an] earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action." *EDP Med. Computer Sys., Inc. v. United States* 480 F.3d 621, 624 (2d Cir. (2007). The doctrine of collateral estoppels bars re-litigation of an issue that was decided in a prior case and applies when "(1) the issues in both proceedings are identical, (2) the relevant issues were actually litigated and actually decided in the prior proceedings, (3) there was a full and fair opportunity for the litigation of the issues in the prior proceeding, and (4) the issues were necessary to support a valid and final judgment on the merits." *Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir. 1995).

Here, there is no final judgment on the merits, an element necessary to invoke either the doctrine of res judicata or collateral estoppel. On April 20, 2004, the parties to *Fowlkes v. Loveridge* signed a "Stipulation Discontinuing Action," which did not expressly provide that the discontinuance was with prejudice. As Magistrate Judge Peebles noted in his order denying plaintiff's application to reopen that action, "[u]nless otherwise stated in the . . . stipulation, the dismissal is without prejudice" except under circumstances set forth in Rule 41(a)(1) of the

Federal Rules of Civil Procedure, which are not present here. Magistrate Judge Peebles further noted that, "at least in theory, the plaintiff is now permitted to commence a new action asserting the same claims as previously set forth in this suit, should he so desire," though he "ma[d]e no findings as to whether such an action would be time-barred." Compl. Exh. W (Order dated August 6, 2004) at 3 n.1; *see also supra* n.11. Thus, the County Defendants' motion to dismiss plaintiff's claim of retaliation with respect to their alleged obstruction of plaintiff's litigation efforts in *Fowlkes v. Loveridge* is denied.

### D. 42 U.S.C. § 1985

To state a claim under 42 U.S.C. § 1985(3), a plaintiff must allege "(1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999). Plaintiff must also show that the conspiracy was motivated by "some racial or perhaps otherwise class-based, invidious discriminatory animus" behind the conspirators' actions. *Id.* (quoting *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993). Claims of conspiracy that are vague and provide no basis in fact may be dismissed. *Leon v. Murphy*, 988 F.2d 303, 311 (2d Cir. 1993) (holding as to a § 1985 claim that "[a] complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss").

Here, plaintiff's § 1985 claim fails because he cannot allege that any injury to his person or property, or a deprivation of a right or privilege arose from the defendants' conduct. As discussed above, plaintiff was designated a risk level 3 offender by the sentencing court, in

accordance with the process provided for under SORA, and not in the arbitrary, illegal manner

he claims.  The conspiracy claim is therefore dismissed.

## II.     Motion to Transfer

The County Defendants, in the alternative to their motion to dismiss, and the DCJS

Defendants seek to transfer this action to the Northern District of New York pursuant to 28

U.S.C. §§ 1391(b) and 1404(a).  Section 1391(b), the relevant venue provision for an action

under § 1983 provides:

> A civil action wherein jurisdiction is not founded solely on diversity of
> citizenship may, except as otherwise provided by law, be brought only in
> (1) a judicial district where any defendant resides, if all defendants reside
> in the same State, (2) a judicial district in which a substantial part of the
> events or omissions giving rise to the claim occurred, or a substantial part
> of property that is the subject of the action is situated, or (3) a judicial
> district in which any defendant may be found, if there is no district in
> which the action may otherwise be brought.

Section 1404(a) further provides that "[f]or the convenience of the parties and witnesses, in the

interest of justice, a district court may transfer any civil action to any other district or division

where it might have been brought."

Generally, the court has broad discretion in determining a motion for transfer, but, under

§ 1404(a), as a threshold matter, it must determine whether the action sought to be transferred is

one that "might have been brought" in the transferee court.  *Blass v. Capital Int'l Sec. Group*,

2001 WL 301137, at *4 (E.D.N.Y. 2001).  Upon that determination, the court considers if

transfer is appropriate given a variety of factors, such as:

> (1) the convenience of witnesses, (2) the convenience of the parties, (3)
> the locus of operative facts, (4) the availability of process to compel the
> attendance of unwilling witnesses, (5) the location of relevant documents
> and the relative ease of access to sources of proof, (6) the relative means
> of the parties, (7) the forums' familiarity with the governing law, (8) the
> weight accorded the plaintiff's choice of forum, and (9) trial efficiency
> and the interest of justice, based on the totality of the circumstances.

*Dealtime.com v. McNulty*, 123 F. Supp. 2d 750, 754-55 (S.D.N.Y. 2000) (citing *Dostana Enterprises LLC v. Federal Express Corp.*, 2000 WL 1170134, *2 (S.D.N.Y. 2000)); *see also Red Bull Assocs. V. Best Western Int'l Inc.*, 862 F.2d 963, 967 (2d Cir. 1988). The party seeking transfer has the burden of making a "clear-cut showing" that transfer is warranted in light of these factors. *O'Hopp v. ContiFinancial Corp.*, 88 F. Supp. 2d 31, 34-35 (E.D.N.Y. 2000).

In this case, a number of factors point to transfer. The defendants remaining in this action are the County Defendants and DCJS Defendants, other than Mr. Steinhardt and Ms. Szady, all of whom reside in the Northern District of New York. The Troy City Court, which registered plaintiff as a risk level 3 offender, is also located in that jurisdiction,[20] and accordingly, any documents relating to plaintiff's registration are likely to be found in the Northern District as well. The court determines in its discretion that transfer is appropriate, and the motion of the County Defendants and DCJS Defendants is hereby granted.

## CONCLUSION

For the reasons that are discussed above, the motions to dismiss of the DOCS Defendants and defendants Steinhardt and Szady are granted. The County Defendants' motion to dismiss is granted in part and denied in part; only plaintiff's claim of retaliation as to the County Defendants' interference with plaintiff's ability to prosecute *Fowlkes v. Loveridge* remains, as all other claims against the County Defendants are being dismissed.

---

[20] On May 5, 2007, the Honorable Kimba Wood, Chief Judge of the United States District Court for the Southern District of New York transferred this action to this court on the grounds that, since plaintiff alleged that he was required to sign the disputed sex offender registration form at Arthur Kill, "a substantial part of the events or omissions giving rise to this claim are alleged to have occurred in Richmond County," located within the jurisdiction of this court. However, the instant motions have now made clear that plaintiff was registered by the Troy City Court.

The motion to transfer venue to the Northern District of New York made by the remaining DCJS Defendants and made in the alternative by the County Defendants is granted. The Clerk of Court is directed to enter judgment accordingly and to transfer this case to the Northern District of New York.

**SO ORDERED.**


_____**/s**_____
**NINA GERSHON**
**United States District Judge**


Dated: November 7, 2008
       Brooklyn, New York